## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**DAVID JOHN PATRICK NELSON,**

       **Plaintiff,**

    **vs.**                          **Civ. No. 13-1224  MV/KK**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

       **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

    **THIS MATTER** is before the Court on Plaintiff's Motion to Reverse and Remand for Rehearing with Supporting Memorandum ("Motion"), filed on May 30, 2014.  (Doc. 20.)  The Commissioner of Social Security ("Commissioner") filed a Response on July 30, 2014 (Doc. 22), and Mr. Nelson filed a Reply on August 14, 2014.  (Doc. 23.)  Having meticulously reviewed the entire record and being fully advised in the premises, the Court recommends that the motion to reverse and remand be **GRANTED.**

### I.  Standard of Review

    Judicial review in a Social Security appeal is limited in scope by 42 U.S.C. § 405(g) to two inquiries: first, whether substantial evidence supports the Commissioner's final decision[2]; and second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).   If substantial evidence supports the

---

[1]  An Order of Reference (Doc. No. 27) was entered on October 3, 2014, referring this case to Magistrate Judge Kirtan Khalsa to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case.

[2]  A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision.  20 C.F.R. §§ 404.981, 416.1481.  This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision.

Commissioner's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted). Courts must meticulously examine the entire record, but may neither reweigh the evidence nor substitute their judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. The decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* While the court may not reweigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. Fed. Aviation Admin.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II. <u>Applicable Law and Sequential Evaluation Process</u>

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).  To qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process.  20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At the first four steps of the evaluation process, the claimant must show that: (1) he is not engaged in "substantial gainful activity"; *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings[3] of presumptively disabling impairments; *or* (4) he is unable to perform his "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *Grogan* 399 F.3d at 1261.  If he cannot show that his impairment meets or equals a Listing, but he proves that he is unable to perform his "past relevant work," the burden of proof then shifts to the Commissioner, at step five, to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity ("RFC"), age, education, and work experience.  *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a social security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised."  *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359,

---

[3] 20 C.F.R. pt. 404, subpt. P. app. 1.

3

360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006).  "This is true despite the presence of counsel."  *Henrie*, 13 F.3d at 361.  "The duty is one of inquiry and factual development," *id.*, "to fully and fairly develop the record as to material issues."  *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997).  This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination.  *Madrid*, 447 F.3d at 791-92.  The duty is triggered by "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation."  *Hawkins*, 113 F.3d at 1167.

### III.  Background and Procedural Record

Plaintiff David Jones Patrick Nelson ("Mr. Nelson") was born on May 29, 1991.  (Tr. 33.[4])  Mr. Nelson has completed at least one year of college. (Doc. 160.)  Mr. Nelson does not have past relevant work experience.[5]  (Tr. 16.)   On July 2, 2010, Mr. Nelson filed an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1382(a)(3).    (Tr. 143-50.)  Mr. Nelson alleged a disability onset date of May 29, 1991, because of osteoarthritis.  (Tr. 160.)  Mr. Nelson has not engaged in substantial gainful activity since his alleged disability onset date.  (Tr. 16.)

Mr. Nelson's application was initially denied on September 7, 2010.  (Tr. 73-76.)  At reconsideration on March 4, 2011, Mr. Nelson alleged, *inter alia*,  that "[e]ven though I have had corrective surgery on my left foot to reduce pain, I still have extensive pain when walking or standing and my range of motion and flexibility has been reduced."  (Tr. 177.)  Mr. Nelson's

---

[4] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 17) that was lodged with the Court on March 28, 2014.

[5] Mr. Nelson has worked off-and-on for brief periods of time.  As such, he does not have work experience as a vocational factor.  *See* 20 C.F.R. §§ 404.1565(a), 416.965(a) ("We consider that your work experience applies when it was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity.").

application was denied again at reconsideration on July 15, 2011. (Tr. 81-84.)  On August 18, 2011, Mr. Nelson requested a hearing before an Administrative Law Judge ("ALJ"), and the ALJ conducted a hearing on March 8, 2012. (Tr. 85-86, 28-67.)  Mr. Nelson appeared in person with his attorney Michael F. Hacker.  *Id.*  The ALJ took testimony from Mr. Nelson (Tr. 33-53) and an impartial vocational expert ("VE"), Tom Griner. (Tr. 53-66.)

On August 21, 2012, the ALJ issued an unfavorable decision.  At step one, he found that although Mr. Nelson worked after the application date, his work activity did not rise to the level of substantial gainful activity.  (Tr. 16.)  Because Mr. Nelson had not engaged in substantial gainful activity for at least twelve months, the ALJ proceeded to step two and found that Mr. Nelson suffered from the following severe impairment:  "[b]ilateral equinovarus deformity, status post surgical correction."  (*Id.*)  The ALJ also found that Mr. Nelson had a non-severe mental impairment of depression.  (*Id.*)  At step three, the ALJ concluded that Mr. Nelson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 18.)

Because he found that none of Mr. Nelson's impairments met a Listing, the ALJ went on to assess Mr. Nelson's RFC.  The ALJ stated that

> [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except he can only frequently balance; and occasionally climb, stoop, kneel, crouch and crawl.

(Tr. 18.)  Finally, the ALJ found that, considering claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (Tr. 22.)

On October 28, 2013, the Appeals Council issued its decision denying Mr. Nelson's request for review and upholding the ALJ's final decision. (Tr. 1-3.)  In reviewing his case, the

Appeals Council considered new evidence Mr. Nelson presented, including treatment records from Dr. Zachary Haas, D.P.M., dated December 13, 2012, and treatment records from Dr. Thomas Gross of Southwest Medical Associates from August 3, 2012 to April 20, 2013.  (Tr. 1, 4, 352-60.)  On May 30, 2014, Mr. Nelson timely filed the instant action seeking judicial review of the Commissioner's final decision.  (Doc. 1.)

### IV.  Medical History

The discussion of Mr. Nelson's medical history that follows captures all pertinent medical information presented to the ALJ and/or considered by the Appeals Council and relevant to the issues Mr. Nelson raised.  *See generally O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994) (holding that new evidence submitted for the first time to the Appeals Council "becomes part of the administrative record to be considered" when evaluating the Commissioner's decision for substantial evidence.)

### A.  Zachary M. Haas, D.P.M.

Podiatrist Zachary Haas treated Mr. Nelson for bilateral club foot and club foot reconstruction from June 23, 2010 to at least December 13, 2012.  On June 23, 2010, Dr. Haas noted that Mr. Nelson was born with bilateral club foot and had club foot reconstruction surgery when he was less than one year old.  (Tr. 241.)  Dr. Haas indicated that Mr. Nelson was suffering from overcorrection of his club foot surgery with subsequent arthritis and functional limitations.  (*Id*.)  On June 28, 2010, Mr. Nelson presented to Dr. Haas with complaints that, despite his custom-made ankle foot orthotics, he continued to experience functional limitations secondary to his foot discomfort.  (Tr. 240.)  On the same date, Dr. Haas prepared a "To Whom It May Concern" letter in which he stated that

> David [N]elson was born with bilateral club foot deformities and underwent
> surgical reconstruction when he was approximately 10 months old.  The patient

> now suffers from overcorrection with residual stiffness, pain, and significant disability of bilateral feet and ankles. David is unable to withstand weightbearing or ambulation greater than 30 minutes per hour. His current symptoms are limiting his daily activity along with his ability to work. David Nelson is suffering from long-term disability.

(Tr. 227.) Dr. Haas educated Mr. Nelson regarding his treatment options, including surgery. (Tr. 241.) Mr. Nelson decided to proceed with surgery, and had a "left medial calcaneal slide osteotomy, navicular cuneiform joint arthrodesis" on July 19, 2010. (Tr. 314.)

On July 29, 2010, Mr. Nelson saw Dr. Haas "10 days status-post calcaneal wedge osteotomy and navicular cuneiform joint arthrodesis." (Tr. 236.) Mr. Nelson stated that he was advancing well and believed he had turned the corner with regard to his pain, although he was not yet bearing weight. (*Id.*) Dr. Haas' examination revealed that all compartments were supple and the incisions were well epithelialized with sutures intact. (*Id.*) X-rays revealed adequate anatomic alignment and position and length of the hardware. (*Id.*) Dr. Haas placed Mr. Nelson in a short leg non-weight-bearing cast. (*Id.*) Dr. Haas instructed him to remain non-weight-bearing with elevation, and to return in two weeks for a cast change. (*Id.*)

On August 12, 2010, Mr. Nelson saw Dr. Haas "three weeks status-post left medial calcaneal slide osteotomy, navicular cuneiform joint arthrodesis." (Tr. 314.) Mr. Nelson reported that he was advancing well and that his pain was well controlled, although he did experience some pain when he accidentally stepped onto his foot. (*Id.*) Dr. Haas placed Mr. Nelson in a short non-weight-bearing cast and instructed him to return in three weeks for cast removal and x-rays to include three views of the left foot and a calcaneal axial. (*Id.*) Mr. Nelson saw Dr. Haas again on September 2, 2010, "six weeks status post-left ankle calcaneal slide osteotomy and navicular cuneiform joint arthrodesis." (Tr. 312.) Mr. Nelson reported that he was advancing well and denied any pain or complaints. (*Id.*) X-rays revealed adequate anatomic

alignment with position and length of hardware. (*Id.*) Mr. Nelson was transitioned into a CAM[6] boot with weight-bearing as tolerated. (*Id.*) Dr. Haas encouraged Mr. Nelson to remove the boot multiple times a day to perform gentle range-of-motion exercises. (*Id.*) Dr. Haas instructed him to return in three weeks for follow-up care.

On September 23, 2010, Mr. Nelson returned two months "status-post calcaneal osteotomy and navicular cuneiform joint arthrodesis." (Tr. 310.) Mr. Nelson stated that he was making some progress advancing off his crutches with his CAM boot, but had some continued discomfort. (*Id.*) Dr. Haas noted mild tenderness to the sinus tarsi region upon palpation. (*Id.*) X-rays revealed adequate anatomic alignment and position and length of the hardware. (*Id.*) Dr. Haas referred Mr. Nelson to physical therapy for aggressive range-of-motion exercises, strengthening, gait training, and advancement out of his boot into a supportive shoe. (*Id.*) Dr. Haas instructed him to return in approximately six weeks for follow-up care and x-rays to include three views of his left foot. (*Id.*) Mr. Nelson expressed his wish to have surgery on his right foot, but Dr. Haas advised him that his left foot would have to be stabilized before he could proceed with surgery on the right foot. (*Id.*)

On February 3, 2011, Mr. Nelson had a preoperative evaluation with Dr. Haas for his upcoming "right medial calcaneal slide osteotomy, navicular cuneiform joint arthrodesis, and possible tendo Achilles lengthening." (Tr. 306.) Mr. Nelson reported that he was advancing well from his left foot surgery. (*Id.*) Mr. Nelson underwent a "right medial calcaneal slide osteotomy" and "right navicular cuneiform joint arthrodesis" on February 8, 2011. (Tr. 294-96.)

On February 15, 2011, Mr. Nelson saw Dr. Haas for "follow-up care status-post calcaneal osteotomy and naviculocuneiform joint fusion." (Tr. 304.) Mr. Nelson stated that he was progressing well, although he continued to complain of pain in his lower extremities. (*Id.*)

---

[6] "CAM" is an acronym meaning "controlled ankle motion."

X-rays revealed adequate anatomic alignment with position and length of hardware.   (*Id.*) Dr. Haas applied a short leg non-weight-bearing cast and Mr. Nelson was instructed to return in two weeks for staple removal and cast reapplication.  (*Id.*)  Mr. Nelson returned for "follow-up care approximately three weeks status-post right foot reconstruction" on March 3, 2011.  (Tr. 303.)  Mr. Nelson stated that he was progressing well and that his pain was better controlled. (*Id.*)  Dr. Haas applied a short leg non-weight-bearing cast and instructed Mr. Nelson not to bear weight and to return in three weeks for cast removal, x-rays, and advancement into a CAM boot. (*Id.*)  At this visit, Dr. Haas noted Mr. Nelson's "chronic pain from his congenital deformities and subsequent operations." (*Id.*)

On March 24, 2011, Mr. Nelson saw Dr. Haas "six weeks status-post right naviculocuneiform joint fusion and medial calcaneal slide osteotomy."  (Tr. 326.)  Mr. Nelson reported that he was progressing well and his pain was well controlled.  (*Id.*)  X-rays revealed adequate anatomic alignment and position and length of hardware, and evidence of fusion at the naviculocuneiform joint.  (*Id.*)  Mr. Nelson was transitioned into a CAM boot and told he could bear weight as tolerated in the boot.  (*Id.*)  Dr. Haas encouraged him to do gentle range-of-motion exercises outside of the boot.  (*Id.*)  Dr. Haas instructed Mr. Nelson to return in one month for repeat x-rays of his right foot and a calcaneal axial.  (*Id.*)  On the same date, Dr. Haas prepared a "To Whom It May Concern" letter in which stated that

> David Nelson is a 19-year-old male who was born with bilateral clubfeet and underwent reconstructive surgery in 1992 . . . .  He had progressive pain and bilateral foot deformity.  He underwent surgical reconstruction to his left foot in July 2010 and to his right foot in February 2011.  The patient has functional limitation with regard to weightbearing activity.  This pathology leads to a slower gait and stride length.  This may affect his ability to attend classes at a large institution on time.

(Tr. 327.)

9

On April 21, 2011, Mr. Nelson presented for follow-up care "status-post right foot reconstruction." (Tr. 325.)  Mr. Nelson stated that he was progressing well in his CAM boot and was bearing weight without crutches.  (*Id.*)  On physical exam, Mr. Nelson had "mild tenderness to palpation to the ankle joint and posterior calcaneus" and "4/5 muscle strength in all quadrants"; "[w]eight bearing examination reveal[ed] adequate anatomic alignment with the calcaneus well aligned underneath the tibia."  (*Id.*)  X-rays revealed adequate anatomic alignment with position and length of hardware with evidence of fusion.  (*Id.*)  Dr. Haas instructed Mr. Nelson to gradually transition from his CAM boot to a supportive shoe with daily activities only.  (*Id.*)  Dr. Haas encouraged him to continue range-of-motion exercises, and told him to return in one month for what would likely be his final postoperative check.  (*Id.*)  Dr. Haas advised Mr. Nelson about the possibility of physical therapy if he struggled with his range of motion and gait.  (*Id.*)

On May 20, 2011, Mr. Nelson saw Dr. Haas for follow-up care "approximately three months status-post right flatfoot reconstruction."  (Tr. 324.)  Mr. Nelson reported that he was progressing well in a regular shoe, and that he had occasional discomfort with prolonged activity and minimal discomfort to his left ankle.  (*Id.*)  Physical exam revealed full muscle strength in all quadrants.  (*Id.*)  Dr. Haas instructed Mr. Nelson to continue advancing with all activity as tolerated, and to return in three months for a postoperative check to include x-rays three views bilateral feet and bilateral calcaneal axial.

On September 8, 2011, Mr. Nelson presented to Dr. Haas complaining of discomfort with his right foot after suffering a fall.  (Tr. 337.)  His physical exam revealed full muscle strength in all quadrants, minimal edema, and tenderness to palpation at the base of the fifth metatarsal.  (*Id.*)  X-rays revealed no change in osseous alignment with previous hardware intact, and no

evidence of acute fracture or dislocation. (*Id.*) Dr. Haas prescribed Motrin, rest, and elevation as needed. (*Id.*)

Mr. Nelson returned to Dr. Haas for follow-up care on January 23, 2012, and stated that he was advancing well with regard to bilateral feet. (Tr. 336.) He stated that he was more functional and active after his surgeries and was pleased with his overall progress. (*Id.*) Mr. Nelson reported that he was attending classes at the University of New Mexico and that his feet were allowing him greater function in terms of attending classes within a reasonable time frame. (*Id.*)

On December 13, 2012, Mr. Nelson presented to Dr. Haas to obtain a letter of current condition and a referral to a pain specialist. (Tr. 353.) Mr. Nelson reported that he had been advancing fairly well until recently, when he needed to increase his walking and functional activity. (*Id.*) He stated that he was experiencing pain to the lateral aspect of bilateral ankles in the medial arch region with prolonged weight-bearing, despite having tried to use supportive shoes and arch supports. (*Id.*) Physical exam revealed full muscle strength in all quadrants, with mild pain with dorsiflexion and plantar flexion, pain on palpation to the lateral ankle gutter bilateral, mild pain along the medial support of the plantar fascia, and supple range of motion at the ankle joint, with mild stiffness and pain at the end of range of motion. (*Id.*) X-rays revealed no change to overall alignment, calcaneus well aligned with respect to the tibia, previous fusion site to the navicular cuneiform joint healed with hardware intact, and anterior osteophyte formation noted to the ankle joint with decreased talar declination angle. (*Id.*)

Dr. Haas diagnosed Mr. Nelson with clubfoot, arthritis, capsulitis, and synovitis. (Tr. 354.) He informed Mr. Nelson that his current limitations and discomfort were likely secondary to the beginning stages of ankle arthritis and the position of his talars, and that non-operative

treatment included anti-inflammatory medications, adequate extrinsic support, and activity modification. (*Id.*) Dr. Haas provided Mr. Nelson with a referral to a pain management specialist, (*id.*), and prepared a "To Whom It May Concern" letter stating that

> David was born with congenital clubfoot deformities bilateral. Patient underwent multiple treatments in his youth and underwent reconstructive bilateral foot and ankle surgery in 2011 [and] 2010. Due to his underlying pathology he suffers from chronic pain and functional limitations. He is unable to weight-bear for greater than 10 min[utes] at a given period of time, unable to weight-bear greater than one hour in an eight-hour workday, unable to perform any heavy lifting, pushing or pulling, and is limited with regards to climbing.

(Tr. 355.)

### B.   **Physical Therapy**

After his left foot surgery Mr. Nelson engaged in eight physical therapy sessions with physical therapist Pat McGowan, from September 24, 2010 to October 27, 2010. (Tr. 269-81.) Mr. Nelson participated in therapeutic exercises, neuromuscular re-education, electronic stimulation, and gait training. (*Id.*) During the course of his physical therapy, Mr. Nelson transitioned from using a brace and cane, to using a CAM boot, to shoes. (*Id.*) Mr. Nelson was consistently described as motivated, able to perform the exercises correctly, and responding well to physical therapy. (*Id.*) However, at his last session, the physical therapist noted decreased range of motion, "perhaps due to increased activity." (Tr. 281.)

### C.   **Dr. Debbie C. Gee, M.D.**

Psychiatrist Debbie Gee ("Dr. Gee") treated Mr. Nelson for depression. On August 30, 2010, she prepared a "To Whom It May Concern" letter as follows:

> David Nelson has been in treatment since 8/16/2006. He was in continuous treatment from this time until January 2010. He returned to treatment in June 2010. He was seen 2-4 times a month.
>
> David was initially diagnosed with Dysthymic Disorder. He was increased to Zoloft 150 mg. He was hospitalized for depression with suicidal thoughts

secondary to abuse by stepfather.  He was also depressed about ½ siblings being abused by stepfather.  He was diagnosed with Major Depression single.

Other issues included moving from one town to another.  David was in 3 different schools in 3 years.  He had peer issues, grieving friends when moving schools.

Health issues include podiatric problems from birth.  These issues prevented [him from] being able to play football in high school and stand on his feet for most entry level jobs.

David has superior intelligence.  He has had difficulty with goals, directions and school because of his depression and health issues.  He has struggled with depression and podiatric problems from early childhood.

(Tr. 243.)

The administrative record includes ten additional records from Dr. Gee dated March 16, 2011, through February 21, 2012, one of which is a second "To Whom It May Concern" letter dated March 28, 2011.  (Tr. 316, 340-51.)  The records primarily document Mr. Nelson's emotions regarding his family history and his mother having been sexually assaulted.  (Tr. 340-45, 348.)  When Mr. Nelson discussed his club feet, he expressed worry about the possibility of passing the condition on to his children (Tr. 350), and depression about the things he cannot do because of his condition.  (Tr. 344).  Dr. Gee's March 28, 2011, "To Whom It May Concern" letter states as follows:

This is an update from 9/10 to the present.  David has continued in therapy once a month from September 2010 until Jan[uary] 2011.  [On] February 7, 2011, David had another podiatric surgery.  This prevented him from coming to the office in February.

The recent podiatric surgeries will slow the deterioration of the bones in his feet and reduce pain.  The surgeries are not corrective.  David will not have normal ambulation.  He will still have major restrictions in standing, walking, and playing sports.  He will not be able to have jobs that involve these activities.

The restrictions of these podiatric disabilities will continue to affect his self esteem and socialization.  The depression that is secondary to the disabilities will not ameliorate.  He will continue to have a significant depression because of these restrictions.

David has a primary depression related to his childhood and abuse by stepfather. The ongoing podiatric disability adds to this depression. There will not be a resolution of his depression. These two elements of depression will continue to affect him into the foreseeable future.

Recent therapy has been devoted to dealing with surgeries and planning for the future. School and future employment has been a major topic of discussion.

David's relationship with his peers has been affected by his physical disability. He has been unable to do normal activities with peers. This became more of a problem in his teen years. It is hard to walk around with peers. It is hard to engage in normal social activities with a slowed gait, limited stamina and pain. He is unable to bowl, dance, stand at concerts, stand in line for events, walk his dog, walk in the mall, bicycle, hike, camp, picnic, and do most sports. All of these limitations drastically curtail his social activities, add to his underlying depression, and affect his vision of the future for future romantic relationships, marriage and family.

(Tr. 316.) Dr. Gee consistently assessed Mr. Nelson with a Global Assessment of Functioning ("GAF") score of 50.[7]

### D.  Thomas Gross, M.D.

Dr. Thomas Gross is Mr. Nelson's primary care physician. (Tr. 230.) On July 7, 2010, Dr. Gross cleared Mr. Nelson for left foot surgery with Dr. Haas. (*Id.*) Mr. Nelson next saw Dr. Gross on December 27, 2010 regarding chronic foot pain. (Tr. 285.) At this appointment, Dr. Gross certified that Mr. Nelson was in chronic pain and was a candidate for medical marijuana. (Tr. 285.) Finally, Mr. Nelson saw Dr. Gross on August 3, 2012. (Tr. 358.) Dr. Gross noted that Mr. Nelson had not opted to pursue his plan to take medical marijuana because of other issues. (*Id.*) Dr. Gross indicated that Mr. Nelson was "fairly pleased with the results" of his equinovarus deformity corrections, that he had finished two years of college, and that he was

---

[7] A GAF score is a subjective rating on a one hundred point scale, divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders*, 32, 34 (4th ed. 2000). A GAF score of 50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *Id.* at 34.

trying to be active and had gotten in better shape.  (*Id.*)  On physical exam, Dr. Gross noted that Mr. Nelson's extremities revealed good pulses, and that he had "very satisfactory equinovarus repair but with obviously a very limited [range of motion]."  (*Id.*)  Dr. Gross assessed Mr. Nelson's depression as resolved.  (*Id.*)

### E.    Adult Function Report – August 12, 2010

Mr. Nelson prepared an Adult Function Report on August 12, 2010, in conjunction with his initial application for SSI.  (Tr. 167-74.)  Mr. Nelson had had surgery on his left foot three weeks before he completed this report.  Mr. Nelson indicated that although he was experiencing some limitations while recovering from surgery, he normally did the following:  (1) cared for his pets; (2) attended to his personal care; (3) prepared simple meals; (4) did light cleaning; (5) loaded the dishwasher; (6) folded laundry; (7) drove; (8) shopped in stores and online; (9) handled his finances; (10) read; (11) watched television; (12) played video games; (13) surfed the internet; (14) spent time conversing daily with others in person, on the phone, and online; (15) went out to eat and to the movies about once a month; and, (16) attended therapy.  (*Id.*)  He indicated that before his surgery he went for walks, rode his bicycle, stood for more than 20 minutes, and ran short distances.  (*Id.*)

Mr. Nelson stated that, as a result of his osteoarthritis, he was limited as follows:  (1) could lift 25-50 pounds; (2) could not squat; (3) could stand for about ten minutes; (4) could walk approximately 100 feet; (5) had to take frequent breaks from tasks that required walking or standing; (6) needed to rest for ten minutes for every five minutes of walking; and, (7) had difficulty concentrating when in pain from standing or walking.  (Tr. 172.)  Mr. Nelson noted that stress exacerbated his depression.  (Tr. 173.)  According to Mr. Nelson, his inability to walk very far without significant pain made it difficult to manage the distances between his classes

and to and from the parking lot at school.  (Tr. 174.)  He stated that "[t]he condition of my feet has been increasingly deteriorating, which makes it very difficult to engage in normal daily activities and to build friendships or meet people."  (*Id.*)

### F.       Physical Residual Functional Capacity Assessment – Lawrence Kuo, M.D.

On September 1, 2010, non-examining State Agency medical consultant Lawrence Kuo, M.D., reviewed Mr. Nelson's medical evidence record and determined that Mr. Nelson had the physical residual functional capacity to (1)  occasionally lift and/or carry 20 pounds; (2) frequently lift and/or carry 10 pounds; (3) stand and/or walk about 6 hours in an 8-hour workday; (4) sit for a total of about 6 hours in an 8-hour workday; and (5) unlimited push and/or pull (including operation of hand and/or foot controls).  (Tr. 245.)  Dr. Kuo included postural limitations of occasional climbing, stooping, kneeling, crouching, crawling, and frequent balancing.  (Tr. 246.)  There were no additional limitations, except to avoid exposure to hazards. (Tr. 247-48.)

Dr. Kuo explained that Mr. Nelson's post-surgical follow up revealed adequate alignment and position of hardware, and that claimant was pleased with his recovery course.  (Tr. 245-46.) Dr. Kuo noted that Mr. Nelson's function indicates he was previously able to go for walks, short runs, ride his bike, and stand for more than twenty minutes.  (*Id.*)  According to Dr. Kuo, Mr. Nelson was observed to walk with a slight limp at a face-to-face interview conducted two weeks after his foot surgery.[8]  (*Id.*)  Dr. Kuo expected continued improvement and predicted that by twelve months from his date of filing, Mr. Nelson should be able to sustain the exertional level outlined in his RFC assessment.  (*Id.*)

---

[8] It is unclear how Mr. Nelson could have been observed "walking," with a limp or otherwise, two weeks after surgery; Mr. Nelson's medical records reflect that he was in a non-weight-bearing short cast for well over two weeks after each of his surgeries in 2010 and 2011.  (Tr. 303, 314.)

**G.**     **Psychiatric Review Technique Form – Elizabeth Chiang, M.D.**

On September 5, 2010, non-examining State Agency medical consultant Elizabeth Chiang, M.D., prepared a Psychiatric Review Technique Form to determine whether Mr. Nelson's mental condition met a listing to warrant automatic approval of benefits.  (Tr. 252-65.)  Dr. Chiang found that Mr. Nelson's mental condition met the listings for affective disorder (depression).  (Tr. 255.)  However, Dr. Chiang determined that Mr. Nelson had no functional limitations and had had no episodes of decompensation.  (Tr. 262.)  Dr. Chiang noted Mr. Nelson's treatment for depression with Dr. Gee.  (Tr. 264.)  Dr. Chiang further noted that, in Mr. Nelson's Adult Function Report, he indicated that "he gets along well with others, engages in leisure activities, played football in high school and participated in band.  He states he has a long attention span – hours.  He can follow instructions."  (*Id.*)  Dr. Chiang concluded that "[t]he claimant's depression does not appear to be of severity that would prevent him from engaging in basic work activities."  (*Id.*)

**H.**     **Third-Party Adult Function Report – March 16, 2011**

Mr. Nelson's mother prepared a Third-Party Adult Function Report on Mr. Nelson's behalf at reconsideration.  (Tr. 184-91.)  She reported that Mr. Nelson was recovering from reconstructive surgery, but that he normally cared for his personal needs, read, got on the computer, prepared simple meals, attended to household chores, shopped by phone and online, managed his finances, visited on the phone and online, and participated in therapy.  (*Id.*)  Mr. Nelson's mother indicated that Mr. Nelson typically drove a vehicle, but was at that time wheelchair-bound and unable to do so.  (Tr. 187.)  She stated that Mr. Nelson's activities were typically limited by how much standing an activity required.  (Tr. 186-87, 191.)  She further stated that Mr. Nelson's relationships were suffering because he could not engage in many of the

activities his friends wanted to do.  (Tr. 189.)  Mr. Nelson's mother reported that Mr. Nelson had

anxiety and depression, and tended to be very hard on himself in stressful situations.  (Tr. 190.)

I.     **Adult Function Report – March 20, 2011**

Mr. Nelson prepared a second Adult Function Report on March 20, 2011, at

reconsideration.  (Tr. 192-99.)  Mr. Nelson described his daily activities as follows:

> I wake up around 5:00-8:00 AM.  I then go to the restroom, take care of personal
> hygiene and natural bodily functions.  . . .  In the kitchen I make myself
> something quick and easy, usually cereal.  After eating I will go to the computer.
> I play video games online with a group of people I have met online and become
> friendly with, I also peruse the web.  After a while I will take a break from the
> computer and go outside.  I tend to either enjoy the view or continue whatever
> book I am currently reading.  I then go back inside and go back to the computer.  I
> will periodically check the stock markets to see if my predictions are accurate.
> Eventually I will get something to eat, usually something frozen and
> microwaveable.  I repeat till around 9-11 PM.

(Tr. 192.)  Mr. Nelson reported that he:  (1) cared for his pets "when able"; (2) attended to his

personal care but could not taking standing showers; (3) prepared simple meals; (4) cleaned up

messes he created; (5) drove; (6) shopped online, and shopped in stores "about once to twice a

month . . . for about ten minutes"; (7) managed his finances; (8) read; (9) watched television;

(10) played video games; and, (11) spent time conversing daily with others in person, on the

phone, and online.   (Tr. 193-96.)  Mr. Nelson indicated that he was more sedentary and less

active since his condition worsened, and was "basically glued to the computer screen."  (Tr.

196.)

Mr. Nelson stated that as a result of his conditions, he was limited as follows:  (1) he

could lift 50 pounds; (2) could not squat; (3) could stand for about fifteen minutes maximum;

(4) could walk about 300 feet before needing to rest for about ten minutes or more; and (5) could

climb two flights of stairs with moderate pain.  (Tr. 197.)  Mr. Nelson reported that pain makes it

difficult for him to concentrate.  (*Id.*)  According to Mr. Nelson's report, he could pay attention

for as long as needed provided he was sitting; he had no trouble following written instructions; he usually followed verbal instructions without fail; he had the utmost respect for authority figures; he handled stress very well, and changes to his routine fairly well; and, he was working on an "embarrassing fear of intangible omnipresent evil in the darkness." (Tr. 198.)

J.    **Case Analysis – Charles F. Bridges, Ph.D.**

On May 15, 2011, non-examining State Agency medical consultant Charles F. Bridges, Ph.D., reviewed Mr. Nelson's medical evidence record on reconsideration.    (Tr. 319.) Dr. Bridges noted that Mr. Nelson continued to attend therapy with Dr. Gee once a month, and that his depression was due to his physical condition and history of abuse by his step-father. (*Id.*)   Dr. Bridges indicated that, functionally, Mr. Nelson's activities of daily living were consistent with that of a teenager still living at home. (*Id.*)  Mr. Nelson had some issues with concentration, but could follow instructions and got along well with others. (*Id.*)  Dr. Bridges affirmed Dr. Chiang's initial level of assessment and her Psychiatric Review Technique Form. (*Id.*)

K.    **Case Analysis – Allen Gelinas, M.D.**

On May 26, 2011, non-examining State Agency medical consultant Allen Gelinas, M.D., reviewed Mr. Nelson's medical evidence record at reconsideration.  (Tr. 328-29.)  Dr. Gelinas noted Mr. Nelson's complaints of pain associated with his left foot, and that he was currently using a wheelchair or crutches to get around following corrective surgery on his right foot.  (*Id.*) Dr. Gelinas further noted Mr. Nelson's activities of daily living as reported on his March 20, 2011 Adult Function Report.  (*Id.*)  Dr. Gelinas determined that it was reasonable to affirm Dr. Kuo's Residual Functional Capacity Form because he predicted that, by June 6, 2011, Mr.

Nelson would not need a cane, crutches, or wheelchair after recovering from his most recent surgery.  (*Id.*)

**L.**      **Hearing Testimony**

The ALJ conducted a hearing on March 8, 2012.  (Tr. 30-66.)  Attorney Michael Hacker represented Mr. Nelson at the hearing.  (Tr. 28.)  Mr. Nelson's mother attended the hearing but did not testify.  (Tr. 32.)

Mr. Nelson testified that he had discontinued taking Zoloft because he was "content with himself."  (Tr. 35.)  Mr. Nelson testified that he drives, and drove himself to the hearing.  (Id.)  He also testified that he attends college, and has mobility issues getting from one class to another.  (Tr. 37-38.)  According to Mr. Nelson, he attends classes five days a week.  (Tr. 37.)  Specifically, he is at school on Mondays, Wednesdays, and Fridays from 12:00 p.m. to 2:00 p.m., and on Tuesdays and Thursdays from 9:30 a.m. to 7:45 p.m.  (Tr. 37.)  Mr. Nelson testified that his mobility issues do not prevent him from keeping up with his school work and that he is maintaining an "A" average in all of his classes.  (Tr. 36, 38.)  He planned to interview for a summer internship with Merrill Lynch.  (Tr. 39.)  Mr. Nelson also testified that he was involved with the Baptist Student Union, but was unable to participate in any of this group's activities that would require him to stand.  (Tr. 40-41.)

Mr. Nelson testified that he can normally walk about 100 feet before his feet start to hurt, and that it is a "little more difficult" to walk on a ramp.  (Tr. 42, 51.)  He can stand for about ten minutes before he must sit down and rest for approximately forty-five minutes.  (Tr. 42, 44.)  If he stands again, he must sit down again in less than ten minutes, and rest for more than forty-five minutes.  (Tr. 44.)  This pattern of decreased ability to stand and increased need for rest continues throughout the day.  (Tr. 45-46.)  Mr. Nelson testified that trying to push himself up a

stair hurts his feet.  (Tr. 51.)  According to Mr. Nelson, it is extremely painful for him to climb a

ladder, and he is unable to squat, run, or ride a bicycle.  (Tr. 51.)  While physical therapy helped

him regain some range of motion in his feet, it is still very limited.  (Tr. 43.)  Mr. Nelson testified

that he has an extremely abnormal gait and has fallen when his feet have "failed on him."  (Tr.

64.)

Mr. Nelson testified about a recent class assignment that took about two hours to

complete because he had to stand and walk in ten to fifteen minute intervals broken up by thirty

or more minutes of sitting and resting.  (Tr. 46, 50.)  Mr. Nelson described having to "force

[himself] to stand and walk" during this particular class assignment.  (Tr. 50.)  The following day

Mr. Nelson was unable to attend his morning classes because the pain in his lower extremities

was too severe for him to stand.  (Id.)  Mr. Nelson testified that any pressure on the soles of his

feet, including sitting with his feet on the floor, causes him pain, which is localized around the

archway and ankle.  (Tr. 42, 46, 47.)

According to Mr. Nelson, he initially declined to go on pain medication because he "did

not want to become addicted to [the] opiates which they were recommending."  (Tr. 47-48.)  Mr.

Nelson testified that he has reconsidered and was looking for a pain specialist.  (Tr. 48.)  He tried

marijuana for pain, which helped immensely, but decided not to pursue it "because of the new

federal law restricting medical marijuana patients from having a firearm," and because he has

political aspirations and does not want to tarnish his image.  (Tr. 52.)

Mr. Nelson testified he applied for SSI to enable him to afford the medical care he needs

without relying on his mother's medical insurance.  (Tr. 52-53.)  He claimed to see SSI benefits

as "temporary assistance," until he has graduated from college and is in the workforce in a

mostly sedentary position.  (Id.)  The ALJ found that Mr. Nelson's "medically determinable

impairments could reasonably be expected to cause the alleged symptoms, and [Mr. Nelson's] statements concerning the intensity, persistence[,] and limiting effects of these symptoms are credible to the extent they are consistent with" his RFC assessments.  (Tr. 20.)

## V. <u>Analysis</u>

Mr. Nelson makes two arguments in support of reversing and remanding his case.  First, he argues that the ALJ erred at step two in finding his depression to be non-severe and failing to discuss his anxiety, and then compounded the step two error by failing to consider the effects of his depression and anxiety on his RFC at step four.  (Doc. 20 at 3.)  Second, he asserts that the ALJ erred at step three in failing to find that his podiatric impairment met a Listing.  (Doc. 20 at 7.)  For the reasons discussed below, the Court finds that substantial evidence supported the ALJ's decisions regarding Mr. Nelson's depression and anxiety, and that the ALJ applied the correct legal standards in this regard.  However, the Court finds that, based on all of the evidence, including new evidence submitted to and considered by the Appeals Council, the Commissioner should have further developed the record regarding whether Mr. Nelson was unable to ambulate effectively for twelve consecutive months or more.  The Court also finds that the ALJ applied an incorrect legal standard in finding that Mr. Nelson was able to effectively ambulate.  As such, the Court recommends that this matter be remanded for a determination regarding whether Mr. Nelson meets a step-three Listing because he was unable to ambulate effectively for twelve or more months consecutively.

### A.    <u>Step Two and Four Findings</u>

Mr. Nelson first argues that the ALJ erred at step two by finding his depression to be non-severe and failing to discuss his anxiety, and then compounded the error by failing at step four to consider the effect of these impairments on his RFC.  (Doc. 20 at 3.)  In so arguing, Mr.

Nelson points to Dr. Gee's "To Whom It May Concern" letters dated August 30, 2010, and March 28, 2011, in which Dr. Gee describes Mr. Nelson's ongoing depression as a result of his physical impairments.  (*Id.* at 4-5.)  Mr. Nelson further points to a number of specific entries Dr. Gee made during several counseling sessions with him from March 16, 2011, through February 21, 2012, in which he described, *inter alia*, his fear of the dark, his fear that he is crazy, his nightmares, and his anger about his mother having been sexually assaulted.  (*Id.* at 6.)  Finally, Mr. Nelson notes that Dr. Gee assigned him a GAF score of 50, indicating "serious symptoms," *or* a "serious impairment in social, occupational or school functioning such as no friends and the inability to keep a job."  (*Id.*)  Mr. Nelson contends that, based on the medical evidence, his depression and anxiety at step two should have been found to be severe.  (*Id.*)

### 1.    Depression

The Commissioner follows a special technique to evaluate the severity of mental impairments and their effect on a claimant's ability to work.  20 C.F.R. § 416.920a(a).  In applying the special technique, the ALJ must first decide whether the claimant has a medically determinable mental impairment.  20 C.F.R. § 416.920a(b)(1).  Here, the ALJ determined that Mr. Nelson had the medically determinable mental impairment of depression.  (Tr. 16.)

The ALJ must next rate the degree of functional limitation resulting from the claimant's medically determined mental impairment in four broad areas, *i.e.*, "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. § 416.920a(c)(3).  Here, the ALJ found that Mr. Nelson had no more than "mild" functional limitations resulting from his depression and had had no episodes of decompensation which had been of extended duration and that Mr. Nelson's depression was therefore non-severe.  (Tr. 17.)  In making these findings the ALJ relied on Mr. Nelson's Adult Function Reports, his

testimony at the hearing, and the opinions of non-examining State Agency medical consultants Elizabeth Chiang, M.D., and Charles F. Bridges, Ph.D. (*Id.*) These findings were supported by substantial evidence.

Even assuming, *arguendo*, that the ALJ erred and Mr. Nelson's mental impairment of depression were severe, it is well settled in the Tenth Circuit that any error at step two is harmless as long as the ALJ finds at least one condition to be severe, so that the five-step evaluation continues. *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008); *Oldham v. Astrue*, 509 F.3d 1254, 1256-57 (10th Cir. 2007). "Once the ALJ finds that the claimant has any severe impairment, he has satisfied the analysis for purposes of step two. His failure to find that additional alleged impairments are also severe is not itself cause for reversal." *Hill v. Astrue*, 289 F. App'x 289, 292 (10th Cir. 2008). Because the ALJ concluded that Mr. Nelson has a severe impairment of bilateral equinovarus deformity status post-surgical correction and proceeded to the next step of the evaluation sequence, any error at step two is deemed harmless. *Id.*

However, "[a] conclusion that the claimant's mental impairments are non-severe at step two does not permit the ALJ simply to disregard those impairments when assessing a claimant's RFC and making conclusions at steps four and five." *Wells v. Colvin*, 727 F.3d 1061, 1068-69 (10th Cir. 2013). Rather, "[i]n his RFC assessment, the ALJ must consider the combined effect of all medically determinable impairments, whether severe or not." *Id.* at 1069 (citing §§ 404.1545(a)(2), 416.945(a)(2)). Mr. Nelson contends that the ALJ improperly disregarded his mental impairment of depression at step four, after finding it non-severe at step two. The Court disagrees.

The ALJ discussed Mr. Nelson's mental impairment of depression when making his findings at step four.  However, the ALJ noted Mr. Nelson's activities of daily living and social functioning as follows:

> [i]n a function report dated March 20, 2011, the claimant describes physical difficulty associated with the use of his lower extremities.  Despite his alleged impairments, the claimant is able to independently care for his personal needs, prepare simple meals and clean the house he shares with his family.  He spends time using the computer for games and going online.  The claimant gets out daily, drives, shops in stores and handles financial transactions without assistance.  He also reads and keeps up with the stock market.

(Tr. 18-19.)  The ALJ further noted that Mr. Nelson is a full-time college student who spends approximately ten hours per day at school on some days, and that he maintains an "A" average in his courses.  (Tr. 19.)  The ALJ found that Mr. Nelson's ability to perform these tasks demonstrates his intellectual capacity.  (Tr. 20.)  In addition, the ALJ discussed Mr. Nelson's work activity as a student software advisor after the alleged onset date of July 2, 2010, along with Mr. Nelson's plans to spend the summer working as an intern with an investment firm.  (Tr. 19-20.)  The ALJ also noted that Mr. Nelson drives himself to campus and found that his ability to drive a motor vehicle demonstrated mental capacity.  (*Id.*)

The Court's meticulous review of the record finds that substantial evidence supports the ALJ's conclusion that Mr. Nelson's non-severe depression did not render him incapable of working and did not further diminish his residual functional capacity.  Mr. Nelson applied for SSI on July 2, 2010, and alleged that osteoarthritis limited his ability to work.  (Tr. 160.)  Mr. Nelson prepared an Adult Function Report on August 12, 2010, and indicated that although he was then in a wheelchair as a result of his *left* foot surgery, he normally cared for his pets, managed his personal care, prepared simple meals, shopped in stores and online, managed his money, had hobbies and interests, conversed with friends, and went out to eat and to movies,

among other things.  (Tr. 167-174.)  Mr. Nelson also reported having a long attention span, unless interrupted by pain.  (Tr. 172.)

Mr. Nelson prepared a second Adult Function Report at reconsideration on March 20, 2011, and again indicated that although he was then in a wheelchair as a result of his recent *right* foot surgery, he cared for his pets when able, managed his personal care, prepared simple meals, cleaned up messes that he created, went outside every day to read and enjoy the view, drove a car, shopped in stores once or twice a month for ten minutes at a time, shopped online, managed his money, had hobbies and interests, and spent time with people.  (Tr. 192-96.)  Mr. Nelson further stated that he could pay attention for as long as he needed to as long as he was sitting, had no trouble following written instructions, could usually follow spoken instructions, had the utmost respect for authority figures, handled stress very well, and handled changes in routine fairly well.  (Tr. 197-98.)  Mr. Nelson stated that he was working on "an embarrassing fear of intangible omnipresent evil in the darkness."  (Tr. 198.)

At the hearing before the ALJ on March 8, 2012, Mr. Nelson testified that he had discontinued taking Zoloft because "he felt content with [him]self."  He further testified that he drove himself to the hearing, attends college classes Monday through Friday, maintains an A average in all four of his classes, plans to interview for a summer internship as a financial analyst, is involving himself with an off-campus student organization, and decided not to pursue a medical marijuana license because he has political aspirations for his future.  (Tr. 30-52.)  Mr. Nelson testified that he applied for SSI so that he could receive Medicaid and have temporary assistance until he graduates from college and is in the workforce in a mostly sedentary position. (Tr. 52-53.)

Although the ALJ did not specifically reference Dr. Gee's GAF scores of 50 at step 4, the ALJ nonetheless "considered, and accounted for" Dr. Gee's opinion within the residual functional capacity determination.  (*See* Tr. at 19-20.)  In any event, a low GAF score does not alone determine disability, but is merely one piece of evidence to be considered along with the rest of the record.  *Petree v. Astrue*, 260 Fed. App'x 33, 41-42 (10th Cir. 2007) (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy."); *Lee v. Barnhart*, 117 Fed. App'x 674, 678 (10th Cir. 2004) (unpublished)  ("Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work.").  Indeed, a GAF score may indicate problems not necessarily related to the ability to hold a job.  *Zachary v. Astrue*, 94 Fed. App'x 817, 819 (10th Cir. 2004).  In the present matter, Mr. Nelson's low GAF score appears to result from problems not related to his ability to hold a job.   In short, upon meticulous review of the entire record, the Court is satisfied that substantial evidence supports the ALJ's findings as they relate to his non-severe impairment of depression.

### 2.   <u>Anxiety</u>

As for the ALJ's alleged error in failing to discuss Mr. Nelson's anxiety at step two,  the Court's meticulous review of the record finds Mr. Nelson has failed to show more than a mere presence of anxiety.  There are only four references in the record to Mr. Nelson's anxiety.  First, Mr. Nelson states in his Disability Report prepared at reconsideration on March 4, 2011, that he was "struggling with depression and anxiety" due to the pain and lack of mobility he experienced after corrective surgery on his right foot.  (Tr. 177.)  Second, Mr. Nelson's mother reported in her Adult Third-Party Function Report on March 16, 2011, that Mr. Nelson has anxiety and

depression.  (Tr. 190.)  Third, Dr. Gee assessed Mr. Nelson as having increased anxiety and depression on March 16, 2011.  (Tr. 350.)  Fourth, Dr. Gee assessed Mr. Nelson as having less anxiety on April 14, 2011.  (Tr. 348.)  Thus, the references in the record regarding anxiety all occurred within a time frame of six weeks, from March 4, 2011, to April 14, 2011.  Further, Mr. Nelson did not indicate either in his application or at reconsideration that he is alleging anxiety as a separate disabling condition.  Mr. Nelson did not raise the issue of anxiety at the hearing before the ALJ, including when Mr. Nelson's counsel questioned the VE about purported work-related limitations.  Finally, there is no indication in the record that Mr. Nelson was taking medication for an anxiety disorder or that he suffered any functional limitations or experienced any episodes of decompensation as a result of such a disorder.

A claimant bears the burden at step two to present evidence that he has a medically severe impairment or combination of impairments.  *Bowen v. Yuckert*, 482 U.S. 137, 146 & n. 5 (1987).  While the showing required is *de minimis*, the claimant "must show more than the mere presence of a condition or ailment."  *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997) (quotation omitted).  Mr. Nelson did not meet this burden.  Thus, there was no error at step two. Because there was no error at step two, the ALJ was not required to discuss Mr. Nelson's anxiety at step four.

For the foregoing reasons, the Court finds that substantial evidence supports the ALJ's determination that Mr. Nelson's depression is non-severe at step two and did not further diminish his residual functional capacity at step four.  Additionally, the Court finds that there was no error in the ALJ's failure to discuss Mr. Nelson's anxiety at step two, and therefore the ALJ was not required to discuss Mr. Nelson's anxiety at step four.

B.     **Step Three Findings**

Mr. Nelson next argues that the ALJ erred at step three in failing to find that his impairments met a Listing.  (Doc. 20 at 7.)  Mr. Nelson contends that the testimony and medical evidence show that he meets the criteria for Listing 1.02 (major dysfunction of a joint(s) (due to any cause)).  Mr. Nelson further contends that the ALJ failed to discuss records that support his inability to ambulate effectively, and that the records show he has been unable to ambulate for more than twelve consecutive months.  (Doc. 20 at 11.)  In particular, Mr. Nelson points to Dr. Haas' December 13, 2012 letter submitted to and considered by the Appeals Council, in which Dr. Haas states that Mr. Nelson is "unable to weight-bear for greater than 10 minutes at a given period of time, unable to weight-bear greater than one hour in an eight-hour workday, unable to perform any heavy lifting, pushing or pulling, and is limited with regards to climbing."  (Doc. 20 at 9, Tr. 355.)  Mr. Nelson also points to Dr. Gross's August 3, 2012, progress note that indicates Mr. Nelson has " a very limited [range of motion]," and to Dr. Gee's March 28, 2011, "To Whom It May Concern" letter in which she identifies walking and standing activities Mr. Nelson cannot do.   (Doc. 20 at 9, Tr. 16, 358.)  Finally, Mr. Nelson points to his testimony regarding his chronic pain and abnormal gait at the March 8, 2012 hearing.  (Tr. 20 at 10.)

At step three, the ALJ determines whether the claimant's impairment "is equivalent to one of a number of listed impairments that the Secretary acknowledges as so severe as to preclude substantial gainful activity."  *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (citing *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988)).  A claimant is conclusively presumed disabled if a claimant's condition meets or equals the severity of a listed impairment. *Williams*, 844 F.2d at 751.  However, a plaintiff "has the burden at step three of demonstrating, through medical evidence, that his impairments 'meet all of the specified medical criteria'

contained in a particular listing."  *Riddle v. Halter*, 10 Fed. App'x 665, 666-67 (10th Cir. 2001

(quoting *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (emphasis

omitted)).   Similarly, to establish that an unlisted impairment is "equivalent" to a listed

impairment, a claimant must present medical findings equal in severity to all the criteria for the

most similar listed impairment.  *Zebley*, 493 U.S. at 531.

"The Secretary explicitly has set the medical criteria defining the listed impairments at a

higher level of severity than the statutory standard.  The listings define impairments that would

prevent an adult, regardless of his age, education, or work experience, from performing *any*

gainful activity, not just 'substantial gainful activity.'"  *Zebley*, 493 U.S. at 532-33 (emphasis in

original).  The listings "streamlin[e] the decision process by identifying those claimants whose

medical impairments are so severe that it is likely they would be found disabled regardless of

their vocational background."  *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987).  "Because the

Listings, if met, operate to cut off further detailed inquiry, they should not be read expansively."

*Drummond v. Astrue*, 895 F.Supp.2d 1117, 1126 (D. Kan. 2012) (quoting *Caviness v. Apfel*, 4

F.Supp.2d 813, 818 (S.D. Ind. 1998)).

Mr. Nelson argues his bilateral equinovarus deformity meets the criteria for Listing 1.02.

Listing 1.02 states:

> 1.02  *Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross
> anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis,
> instability) and chronic joint pain and stiffness with signs of limitation of motion
> or other abnormal motion of the affected joint(s) and findings on appropriate
> medically acceptable imaging of joint space narrowing, bony destruction, or
> ankylosis of the affected joint(s).  With:
>
> A.  Involvement of one major peripheral weightbearing joint (*i.e.,* hip, knee, or
> ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.R.F. 404, Subpt. P, App. 1.  The Commissioner concedes that in this case, "[t]he primary obstacle to overcome to satisfy Listing 1.02A is not the diagnosis of a major dysfunction in a joint, which the Commissioner acknowledges that [Mr. Nelson] experiences, but whether the dysfunction results in the inability to ambulate effectively." (Doc. 22 at 11.)   Thus, the question is whether Mr. Nelson's major dysfunction resulted in an inability to ambulate effectively that lasted or is expected to last for at least 12 months.   20 C.F.R. 404, Subpt. P, App. 1.

An inability to ambulate "effectively means an extreme limitation of the ability to walk: *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities."   *Id.*   "Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.*   On the other hand, to ambulate effectively, "individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school."  *Id.*  Examples of ineffective ambulation "include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulation activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail."  *Id.*   "The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation."  *Id.*

In Mr. Nelson's case, the ALJ's step three findings were as follows:

A comparable review of the objective evidence with the Listings of Impairments leads the undersigned to conclude that these impairments are not severe enough to

meet or medically equal one of the impairments listed in Appendix 1, Subpart P. In addition, no examining or non-examining physician has noted that the claimant's impairments equal any of the listed impairments. Specifically, the claimant does not meet the requirements of listing[] 1.02. Although the claimant was unable to ambulate effectively during a brief period following surgical correction of his lower extremities, the evidence shows that this was resolved in less than 12 months. According to 1.00B2b, "The inability to ambulate effectively . . . must have lasted, or be expected to last, for at least 12 months." Here, the medical records indicate that the claimant had recovered from two (2) separate corrective surgeries in less than 12 months. Thus, the requirements of Listing 1.02 have not been met.

(Tr. 18.)

The Court finds two flaws in this reasoning. First, there is no requirement that an "examining or non-examining physician" determine that a claimant meets a Listing, for the ALJ to make such a finding. 20 C.F.R. § 416.927(d). Rather, this determination is reserved to the Commissioner. *Id.* (whether a claimant's impairments meet or equal a Listing is "not [a] medical opinion[]," but rather is an "opinion[] on [an] issue[] reserved to the Commissioner because [it is an] administrative finding that [is] dispositive of a case"); *see also* 20 C.F.R. § 416.927(e)(3) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner."). In this matter, however, it appears that the ALJ found that Mr. Nelson did not meet a Listing, at least in part, because no physician determined that he did. (Tr. 18.) In this regard, the ALJ applied an incorrect legal standard in finding that Mr. Nelson did not meet the requirements of a Listing. The Court therefore recommends that this matter be remanded for further proceedings regarding whether Mr. Nelson meets the requirements of a Listing, applying the correct legal standard.

The second flaw in the ALJ's decision at step three concerns his finding that Mr. Nelson was unable to effectively ambulate for fewer than twelve consecutive months. The ALJ based this finding on his determination that Mr. Nelson recovered from his two surgeries, in July 2010

and February 2011, in less than twelve months.  (Tr. 18.)  However, the ALJ did not sufficiently develop the record to determine whether Mr. Nelson was unable to effectively ambulate for twelve consecutive months after his second surgery.  In part, this appears to be because the ALJ did not have the benefit of Dr. Haas' December 13, 2012 letter, which was submitted for the first time to the Appeals Council and which the Appeals Council considered and made part of the record.  *O'Dell*, 44 F.3d at 859.

Dr. Gee's March 28, 2011 letter, which was written after Mr. Nelson's second surgery, states that by that date Mr. Nelson was unable to "bowl, dance, stand at concerts, stand in line for events, walk his dog, walk in the mall, bicycle, hike, camp, picnic, and do most sports." (Tr. 316.)  At the hearing on March 8, 2012, Mr. Nelson testified that he was able to stand for ten minutes at most, that he could only walk 100 feet before experiencing foot pain, that walking on a ramp was "a little more difficult" than walking on level ground, that "trying to push [him]self up a stair" caused him pain, and that he tried "never to climb a ladder."  (Tr. 42-51.)  He further testified that a particular school project which required him to walk for ten to fifteen minutes at a time, with thirty minute rest breaks, for two hours was so debilitating that he could not stand the following morning.  (*Id.* at 46, 50.)  Then, Dr. Haas' December 13, 2012 letter indicates that Mr. Nelson "suffers from chronic pain and functional limitations.  He is unable to weight-bear for greater than 10 min[utes] at a given period of time, unable to weight-bear greater than one hour in an eight-hour workday, unable to perform any heavy lifting, pushing or pulling, and is limited with regards to climbing."  (Tr. 355.)

Read together, Dr. Gee's and Dr. Haas' letters and Mr. Nelson's testimony suggest that Mr. Nelson has been unable to "walk a block at a reasonable pace," "walk on rough or uneven

surfaces," or "climb a few steps at a reasonable pace with the use of a single hand rail"[9] from some time on or after March 28, 2011 to at least December 13, 2012.  20 C.F.R. 404, Subpt. P, App. 1; (*see* Tr. 42-51, 64.)  As such, they constitute objective evidence suggesting that Mr. Nelson may have been unable to effectively ambulate for more than twelve consecutive months. As noted above, "objective evidence . . . suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation" triggers an obligation for the Commissioner's designees to "fully and fairly develop[] the record as to material issues."  *Hawkins*, 113 F.3d at 1167.

The evidence described above triggered an obligation for the Commissioner to fully and fairly develop the record regarding whether Mr. Nelson was unable to effectively ambulate for at least twelve consecutive months after his second surgery.  However, the record on this point contains significant gaps, particularly concerning when Mr. Nelson's alleged post-surgical inability to effectively ambulate began, and for how many consecutive months it has persisted at a sufficiently severe level.  Without the full development of such evidence in the record, the Court is unable to assess whether substantial evidence supports the ALJ's finding that Mr. Nelson's impairments did not meet or equal Listing 1.02.  *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) ("In the absence of ALJ findings supported by specific weighing of the evidence, we cannot assess whether relevant evidence adequately supports the ALJ's conclusion that [the claimant's] impairments did not meet or equal any Listed Impairment").  The Court therefore recommends reversing the Commissioner's decision in this matter, and remanding it for further proceedings to develop the record on these points, and thereafter for a determination regarding

---

[9] Mr. Nelson's March 20, 2011 Adult Function Report, in which Mr. Nelson stated that he limited his shopping in stores to one to two times per month for ten minutes, also suggests an inability to "carry out routine ambulation activities, such as shopping."  (Tr. 195.)

whether Mr. Nelson meets Listing 1.02 for major dysfunction of major peripheral weight-bearing joint(s) resulting in an inability to ambulate effectively.

## VI.  Recommendation

For the reasons stated above, the Court recommends that Mr. Nelson's Motion to Reverse or Remand be GRANTED, and that this matter be REMANDED to the Commissioner for further proceedings.

Timely objections may be made pursuant to 28 U.S.C. § 636(b)(1)(c).  Within fourteen (14) days after a party is served with a copy of these proposed findings and recommendations that party may, pursuant to  § 636(b)(1)(c), file written objections to such proposed findings and recommendations with the Clerk of the United States District Court for the District of New Mexico.  A party must file any objections within the fourteen (14) days period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE